UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:24-cr-00343-SRC-1 |
| | ) | |
| SAMUEL DAVIS, | ) | |
| | ) | |
| Defendant. | ) | |

## Memorandum and Order

Samuel Davis has four motions pending before the Court:  (1) a Motion to Suppress Physical Evidence, doc. 44; (2) a Motion to Suppress Statements, doc. 44; (3) a Motion to Dismiss the Indictment, or, in the Alternative, for a Bill of Particulars, doc. 45; and (4) a Motion to Sever the Defendants on the Indictment, doc. 46.  For the reasons explained below, the Court denies Davis's motions and adopts the Magistrate Judge's Report and Recommendation.

## I.    Procedural history

The Court referred Davis's motion to United States Magistrate Judge Joseph S. Dueker pursuant to 28 U.S.C. § 636(b).  *See* docs. 1, 2.  On November 21, 2025, Judge Dueker issued a Report and Recommendation ("R&R"), recommending that the Court:  (1) deny Davis's Motion to Suppress Statements, doc. 44; (2) deny Davis's Motion to Suppress Physical Evidence, doc. 44; (3) deny Davis's Motion to Dismiss the Indictment, or, in the Alternative, for a Bill of Particulars, doc. 45; and (4) deny Davis's Motion to Sever the Defendants on the Indictment, doc. 46.  Doc. 97 at 26 (The Court cites to page numbers as assigned by CM/ECF.).  Davis timely filed objections to the R&R, doc. 98, the United States responded to Davis's objections, doc. 102, and Davis filed a notice of his intent to not file a reply, doc. 104.

II.    **Standard**

When a party objects to a magistrate judge's R&R, the district judge must conduct a de novo review of the portions of the report, findings, or recommendations to which the party objects. *See* 28 U.S.C. § 636(b)(1) ("A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."); *United States v. Lothridge*, 324 F.3d 599, 600 (8th Cir. 2003) (citing 28 U.S.C. § 636(b)(1)). In making its de novo determination, the Court reviewed the record related to Davis's motions.

III.    **Statement of facts**

On July 4, 2023, Joseph Percich, a detective for the St. Louis County Police Department, responded to DePaul Hospital regarding an alleged assault involving two Northwoods Police Officers. Doc. 90, Evid. Hr'g Tr. at 5:20–6:23. When he arrived, Detective Percich spoke with uniformed county patrol officers and interviewed the purported victim, C.G. *Id.* at 6:24–7:2. The patrol officers and C.G. essentially provided Detective Percich with the same information: C.G. had been arrested for shoplifting and trespassing at the Walgreens in Northwoods, Missouri; where he was handcuffed, driven to the City of Kinloch, and physically assaulted with pepper spray and a baton by a white male Northwoods police officer. Ex. 4, Aff. at ¶¶ 2, 5; *see also* Ex. 5, Aff. at ¶¶ 2, 5.

After receiving this information, Detective Percich traveled to the Walgreens in Northwoods, Missouri and obtained video surveillance footage of the events leading to the alleged assault. *See* Ex. 4, Aff. at ¶ 7. This footage depicted two Northwoods police officers (whom the Northwoods Police Chief later identified as Davis and Hill) interacting with C.G. at

the scene. *Id.* at ¶¶ 7–8. Specifically, the footage shows Davis handcuffing C.G., securing him in the back of his marked patrol vehicle, and driving away. *Id.* at ¶ 7.

Three days later, Detective Percich contacted Davis by phone. Doc. 90, Evid. Hr'g Tr. at 8:12–8:18. During this recorded phone call, Davis agreed, multiple times, to meet Detective Percich for an interview. *See* Ex. 1 at 0:56–1:14, 2:10–2:38. And while Davis informed Detective Percich that he would need his union representative present only if Detective Percich wanted to obtain a written statement, *see id.* at 2:39–2:47, he expressed no other concerns regarding the interview, *see generally id.* Davis also agreed to meet Detective Percich at St. Louis County Police Headquarters for the interview and expressed no hesitation about the meeting location. *See id.* at 5:04–5:39.

The next day—July 8, 2023—Davis met with Detective Percich and Detective Justin Adams at police headquarters. Doc. 90, Evid. Hr'g Tr. at 9:15–10:7, 10:24–11:2. The detectives conducted the interview in a large conference room on the second floor. *Id.* at 10:8–10:23. Detective Percich, who was off-duty that day, wore jeans and a polo, while Detective Adams wore a shirt and tie. *Id.* at 11:3–11:6. Neither officer was armed. *Id.* at 11:7–11:8.

During the two-hour interview, Davis sat across from the detectives at a large, 10- to 12-chair conference room table. *Id.* at 10:20–11:17. Early on, Davis and Detective Percich had the following exchange:

PERCICH:  Uhm, we are doing a criminal investigation.

DAVIS:  Mhm.

PERCICH:  Okay?  Uhm, to figure out what happened to this guy.  If, if whatever happened to him is a crime, is it not, all that type of stuff.

DAVIS:  Right.

Ex. 2 at 1:15–1:28.  David and Detective Percich also discussed the voluntary nature of the

interview:

> PERCICH:  Uhm, do you understand that today that your statement is voluntary?
>
> DAVIS:  Yes.
>
> PERCICH:  Ok.  You haven't been, have you been threatened, compelled, promised anything to make you be here to make a statement?
>
> DAVIS:  No, not from, not from y'all, no.
>
> PERCICH:  Okay.  Uhm, has somebody else threatened you or promised you?
>
> DAVIS:  Just lots of very oddly direct, but vague conversations over the phone with a few other officers.  It's just been . . . most, most officers have been reaching out to me to make sure I'm doing okay.

*Id.* at 6:40–7:07.  A few minutes later, Detective Percich again confirmed that the interview was

voluntary:

> PERCICH:  My side of this is it is completely voluntary.
>
> DAVIS:  Okay.
>
> PERCICH:  You are not under arrest.
>
> DAVIS:  Right.
>
> PERCICH:  Do you understand that?
>
> DAVIS:  Yes.
>
> PERCICH:  I didn't arrest you.  We spoke on the phone, you came in here voluntarily, correct?
>
> DAVIS:  Correct.
>
> PERCICH:  You remember the door you came in?
>
> DAVIS:  Yes.  [laughs]
>
> PERCICH:  If you decide you don't like us and we're, for whatever reason, that's the door to leave.

DAVIS:  Right.

PERCICH:  Okay.  Uhm.  I just want to make sure that we're on the same page.

DAVIS:  Right.

PERCICH:  Alright?  Any questions about that?  Concerns?

DAVIS:  No not at all.

PERCICH:  Okay.  If you do during the course of this, just ask me.

DAVIS:  Gotcha.

*Id.* at 8:27–8:56.

Davis—who had been a police officer for nearly three years at the time, *id.* at 6:10–6:30, 24:39–24:48—then spoke with the detectives and answered their questions for approximately two hours.  He acknowledged that he detained and handcuffed C.G., whom he knew as a repeat offender, for theft and trespassing at Walgreens.  *Id.* at 16:55–19:20.  He also stated that he took C.G. to the City of Kinloch in his patrol vehicle at the direction of his supervisor, Corporal Hill, and dropped C.G. off near a Pepsi plant.  *Id.* at 19:20–19:56, 24:30–25:42, 34:26–35:16.  Davis admitted that he didn't arrest C.G. and take him to jail because he didn't want to write another police report.  *Id.* at 19:28–19:43, 20:13–20:28.  He then confessed that he did not notify the dispatcher of his whereabouts or intentions.  *Id.* at 42:50–43:05.

Davis then explained that he removed C.G.'s handcuffs once they arrived in Kinloch.  *Id.* at 35:18–36:10.  He said that he warned C.G. not to return to Northwoods because he would be assaulted.  *Id.* at 36:10–36:20.  Davis claimed that, as he attempted to resecure his handcuffs, his pepper spray inadvertently deployed onto his arm after his shirt sleeve became stuck on the canister.  *Id.* at 36:25–36:45.  He stated that he wiped the spray from his arm and then noticed that C.G. was on the ground.  *Id.* at 36:45–37:00.  Despite this, Davis expressed that C.G.

indicated that he was okay.  *Id.* at 37:00–37:10.  Davis later stated that he left the area and cleared the call for service as "GOA," indicating to dispatchers that C.G. was "gone on arrival" when Davis arrived at the Walgreens.  *Id.* at 44:15–46:10.  Davis admitted to the detectives that this report was not accurate.  *Id.*

Later in the interview, Davis consented to having his cell phone examined and signed a Consent to Search form memorializing his consent, despite the detectives' stating that they would need to keep his phone for a few days.  *Id.* at 1:47:10–1:55:45.  Davis also provided his phone number, phone passcode, and Google account to the detectives.  *Id.* at 5:17–5:25, 1:48:13–1:48:27, 1:51:25–1:52:10; *see also* doc. 90, Evid. Hr'g Tr. at 19:5–20:22; Ex. 3; Ex. 4, Aff. at ¶ 13; Ex. 5, Aff. at ¶ 13.  At no point during the interview did the detectives advise Davis of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966).  *See generally* Ex. 2.  Nor did Davis expressly waive his *Miranda* rights.  *See generally id.*  Following the interview, Davis left police headquarters.  Ex. 2 at 2:00:00–2:02:32; doc. 90, Evid. Hr'g Tr. at 24:3–24:12.  The detectives later arranged for a forensic analysis of the phone and had it returned to Davis the next day. Doc. 90, Evid. Hr'g Tr. at 16:23–18:1.

On July 11, 2023, Detective Percich applied for and obtained a search warrant for Davis's Google account.  *See* Ex. 4.  Detective Percich presented the affidavit, application, and search warrant to St. Louis County Circuit Judge John R. Lasater, who approved the application and signed the search warrant, which Detective Percich later executed.  *Id.*  Then, on July 14, 2023, Detective Percich applied for and obtained a search warrant for Davis's AT&T cell phone records.  *See* Ex. 5.  He presented the affidavit, application, and search warrant to St. Louis County Circuit Judge Nicole Zellweger, who approved the application and signed the search

warrant. *Id.*  In the affidavits supporting the search warrant applications, Detective Percich

included the following information:

> On Tuesday, July 4, 2023, patrol officers assigned to the St. Louis County Police Department's Central County Precinct received a radio assignment for a "person down" at/near the intersection of Martin Luther King Boulevard and Hugo Avenue in the City of Kinloch.  Upon arrival, patrol officers located the victim, C.G., whose identity is known to the affiant, in a semi-unconscious state in a field positioned off the roadway.  C.G. was bleeding from the head and face. . . . [P]atrol officers learned C.G. was arrested in the City of Northwoods, handcuffed, driven to the City of Kinloch, sprayed with oleoresin capsicum or "OC", commonly referred to as "pepper spray", and struck repeatedly with a baton.  C.G. was reportedly released and warned not to return to the City of Northwoods.
>
> C.G. was conveyed to DePaul Hospital by ambulance and later determined to have sustained "trauma", to include, but not limited to, lacerations and abrasions to his head, a bloody nose, and a closed fracture of the right mandibular angle (jaw). . . . C.G. has returned to the hospital for a second occasion relative to back pain sustained during the incident.
>
> Detectives . . . were summoned to the hospital to assume the criminal investigation.
>
> Detectives obtained a statement from [ ] C.G. which was consistent with the above information.  C.G. reiterated he was arrested at the Walgreen's [sic] at 7199 Natural Bridge Road, within the City of Northwoods, after shoplifting and trespassing.  He alleged he was handcuffed, driven to the City of Kinloch, and physically assaulted with OC spray and a baton by a white male police officer from the Northwoods Police Department prior to his release. . . .
>
> An interview with the reporting party was conducted at which time she advised she observed a Northwoods Police Department patrol vehicle parked at the intersection of Martin Luther King Boulevard and Hugo Avenue.  She observed a uniformed police officer, a white male, bent over at the waist standing over a red object on the ground with his arms extended downward.  The police officer then reportedly hurriedly entered his vehicle and left the area.  The reporting party initially left the area, unaware the red object was a person.  Curious and concerned, the reporting party returned and determined the red object she located was in fact C.G.[,] who was dressed in a red t-shirt.
>
> Video surveillance footage was obtained from Walgreen's [sic] and determined C.G. was in fact handcuffed behind his back by a white male police officer from the Northwoods Police Department.  He was then secured in the rear seat of the fully marked patrol vehicle.  A police corporal, a black male, was also on scene. C.G. was then driven from the scene by the white male police officer.

. . . Colonel Dennis Shireff, Chief of the Northwoods Police Department . . . identified the white male police officer as Samuel Davis and the black male police corporal as Michael Hill. Both were on duty in the City of Northwoods at the time of the incident. No other police officers from the Northwoods Police Department were on-duty during the relevant period of time.

Further investigation revealed a police report was not authored and police commanders from the Northwoods Police Department were not notified of a use of force. The dispatcher was not informed of the conveyance of C.G. Furthermore, Police Officer Davis turned off his body worn camera after he secured C.G. in the patrol vehicle. The camera was not re-activated. As of this writing, it does not appear as if Corporal Hill's body worn camera was ever activated. After the incident in the City of Kinloch, Police Officer Davis coded the call "GOA" or "gone on arrival", indicating the suspect was not on scene at Walgreen's [sic] when the police officers arrived.

During an interview of Police Officer Davis, he advised he detained C.G., a repeat offender for theft and trespassing at Walgreen's [sic], in handcuffs. C.G. was then secured in the patrol vehicle. Police Officer Davis advised he drove C.G. to the City of Kinloch at the direction of his supervisor, Corporal Hill. Police Officer Davis said he did not arrest C.G. and convey him to a jail in reference to the criminal offenses because he did not want to write another police report. He also acknowledged not notifying the dispatcher of his whereabouts or intentions.

Once in the City of Kinloch, Police Officer Davis claimed he removed the handcuffs from C.G. He acknowledged he warned C.G. not to return to the City of Northwoods, saying he would be assaulted if he did so. Police Officer Davis reported that as he attempted to re-secure his handcuffs, OC was inadvertently deployed after his shirt sleeve became stuck on the canister. Angry, Police Officer Davis said he wiped the OC from his own arm and then saw C.G. on the ground. He inquired if C.G. was okay at which time he alleged C.G. waved his arm in what he interpreted as a "sign of life". Police Officer Davis then left the area and cleared the call for service "GOA."

Ex. 5, Aff. at ¶¶ 2–11; *see also* Ex. 4, Aff. at ¶¶ 2–11.

## IV.    Discussion

### A.    Motion to suppress statements

Davis first objects to Judge Dueker's recommendation to deny his Motion to Suppress Statements. Doc. 97 at 8–11. The Court addresses each of Davis's objections in turn.

### 1. Custodial interrogation

Davis objects to Judge Dueker's conclusion that Davis was not "in custody" for *Miranda* purposes. Doc. 98 at 1. He argues that Judge Dueker ignored "critical, undisputed facts," including the following: (1) "detectives never advised Davis that he was a target or suspect," (2) the two-hour interview "occurred at police headquarters, in an interrogation-style environment," and Davis was informed that he "had to ask permission" to leave," (3) detectives confronted Davis with evidence connecting him to the alleged assault, and (4) Davis was "compelled by implicit authority pressures unique to police-police interrogations." *Id.* at 1–2. Thus, under the "totality of the circumstances," Davis argues, a reasonable person in his situation would not have felt free to terminate questioning, rendering him "in custody" for *Miranda* purposes. *Id.* at 2.

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. So, before a law enforcement officer may interrogate a suspect in a custodial setting, he must first advise the suspect of his right not to answer questions and to have an attorney present. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). A person is "in custody" for *Miranda* purposes when he is formally arrested or when his freedom of movement is restricted in a manner "akin to a formal arrest." *United States v. Ollie*, 442 F.3d 1135, 1137 (8th Cir. 2006) (citing *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam)). To determine whether a suspect was "in custody," the Court must "examine the extent of the physical or psychological restraints placed on the suspect during interrogation" to determine whether a "'reasonable person in the suspect's position'" would have understood that he was in custody. *United States v. Griffin*, 922 F.2d 1343, 1347 (8th Cir. 1990). This inquiry requires the Court to consider "the totality of the circumstances." *Id.*

9

The court in *Griffin* identified several factors that are relevant to the custody inquiry:

(1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

*Id.* at 1349. The first three are "mitigating factors" that cut against a finding of custody, while the last three are "coercive factors" that cut in favor of a finding of custody. *See id.* The Court considers each factor in turn.

### a.      Advice given by officers

The "most obvious" way to demonstrate that a suspect is not "in custody" is for officers to inform the suspect "that an arrest is not being made and that the suspect may terminate the interview at will." *Id.* Here, Detective Percich told Davis that he was not under arrest, that the interview was voluntary, and that Davis was free to leave at any time. *See* Ex. 2 at 8:27–8:56. And Davis indicated that he understood this information. *See id.* This mitigating factor therefore cuts against a finding of custody. *Griffin*, 922 F.2d at 1349.

### b.      Restraint

"Circumstances of custody are frequently obviated where the suspect's freedom of action is not curtailed during questioning." *Id.* at 1350. Here, the record does not indicate that Detectives Percich and Adams restrained Davis's freedom of movement in any way. Instead, the detectives sat across from Davis in a large conference room and informed him that he was free to leave at any time, through the same door through which he entered. *See* doc. 90, Evid. Hr'g Tr. at 10:3–10:23, 12:1–12:6; Ex. 2 at 8:27–8:56. Davis does not dispute that he remained

10

unrestrained during the entirety of the interview.  *See generally* doc. 98.  Thus, this factor also cuts against a custody finding.  *Griffin*, 922 F.2d at 1349.

### c.   Initiation of contact

This factor concerns "whether the interview was instigated by authorities or whether the suspect initiated contact or voluntarily acquiesced to official questions."  *Id.* at 1351.  Here, Detective Percich initiated contact with Davis via the phone call on July 7, 2023.  Doc. 90, Evid. Hr'g Tr. at 8:12–8:18; Ex. 1.  But during this phone call, Davis agreed multiple times to meet with Detective Percich for the interview.  Doc. 90, Evid. Hr'g Tr. at 9:2–9:6; Ex. 1 at 0:56–1:14, 2:10–2:38.  And, the record indicates that rather than being transported, Davis came to the interview site on his own.  *See* Ex. 1 at 5:04–5:39 (Detective Percich stating that he would text Davis the address to county headquarters).  True, Davis did inform Detective Percich that he would need his union representative present if he would be giving a written statement.  Ex. 1 at 2:39–2:47.  But Davis otherwise voiced no concerns about the interview itself, *see generally id.*, nor did he express any hesitation about meeting Detective Percich at county headquarters, *see id.* at 5:04–5:39.  Thus, Davis "voluntarily acquiesced" to the interview, which cuts against a finding of custody.  *Griffin*, 922 F.2d at 1349.

### d.   Strong-arm tactics or deceptive stratagems

A "strong presumption of impropriety" attaches to circumstances where officers use coercive interrogation techniques to obtain confessions.  *Id.* at 1351.  But here, the record does not demonstrate that Detectives Percich and Adams used strong-arm tactics against Davis during the interview.  Neither officer was armed, doc. 90, Evid. Hr'g Tr. at 11:1–11:8, and no indication exists that either officer adopted a "threatening posture" toward Davis or made "a physical show of force during the questioning," *United States v. Axsom*, 289 F.3d 496, 502 (8th Cir. 2002).  The

11

record also does not indicate that the detectives attempted to deceive Davis in any way during the interview, and Davis does not argue otherwise. The absence of this factor therefore cuts against a custody finding. *Griffin*, 922 F.2d at 1349.

### e.  Police-dominated atmosphere

"An interrogation which occurs in an atmosphere dominated by the police . . . is more likely to be viewed as custodial than one which does not." *Id.* at 1351–52. To determine whether an interrogation was police-dominated, courts consider "the entire context of the questioning, including such considerations as place and length of the interrogation." *Id.* at 1352. Here, Davis's two-hour interview occurred at police headquarters. Doc. 90, Evid. Hr'g Tr. at 10:3–10:5. But "*Miranda* warnings need not be imposed simply because the questioning takes place in a police station." *United States v. Galceran*, 301 F.3d 927, 931 (8th Cir. 2002). Indeed, Davis voluntarily appeared for this interview—which took place in a spacious conference room—and sat across from Detectives Percich and Adams at a large, 10-12 chair conference table. Doc. 90, Evid. Hr'g Tr. at 9:2–11:12. Detective Percich was in street clothes, *see id.* at 11:3–11:5, and neither detective was armed, *see id.* at 11:7–11:8. The Eighth Circuit has held that a similar situation was not police-dominated, even though the interviewing officers were armed and the interview occurred at a police station. *See Galceran*, 301 F.3d at 929, 930–31.

And, contrary to Davis's assertions, *see* doc. 98 at 2, a reasonable person in his position (i.e., a person who had been a police officer for nearly three years, *see* Ex. 2 at 24:39–24:48) would not have perceived his situation to be one of police custody. *See United States v. LeBrun*, 363 F.3d 715, 723 (8th Cir. 2004) (noting that courts must conduct the "objective custody analysis" from the standpoint of "a reasonable person in the *defendant's position*," not from that of "any random reasonable person" (emphasis in original)). Indeed, the environment of a police

station, or even police headquarters, would have been more familiar (and therefore less intimidating) to Davis than it would be to an ordinary civilian. *See id.* at 724 (holding that the defendant was not in custody in part because he "had prior experience with the practice and procedure of a particular law enforcement organization").

Davis also argues that officers informed him during the interview that "if he wanted to leave, he had to ask permission." Doc. 98 at 2. But the Court finds this argument wholly unsupported by the record. *See* Ex. 2 at 8:27–8:56. And, in the final moments of the interview, Davis states "I appreciate you guys working with me as much as you can. . . . I appreciate it." Ex. 2 at 2:00:22–2:02:32. The Court finds that Davis's interview was not police-dominated. The absence of this factor cuts against a finding of custody. *Griffin*, 922 F.2d at 1349.

### f.    Arrest

The final *Griffin* factor concerns "whether the suspect was placed under arrest at the termination of the questioning." *Id.* at 1349. Detectives Percich and Adams did not arrest Davis at the conclusion of the July 8, 2023 interview—Davis left county headquarters voluntarily. Doc. 90, Evid. Hr'g Tr. at 24:3–24:12; Ex. 2 at 2:00:00–2:02:32. The absence of this factor cuts against a finding of custody. *Griffin*, 922 F.2d at 1349.

### g.    Other indicia of custody

Davis argues that other "critical, undisputed facts" support a finding that he was in custody for *Miranda* purposes. Doc. 98 at 1–2. First, he states that the detectives did not advise him at the time of questioning that he was the sole suspect in a felony investigation. *Id.* at 2. But "a police officer's subjective view that the individual under questioning is a suspect, if

13

undisclosed, does not bear upon the question whether the individual is in custody." *Stansbury v. California*, 511 U.S. 318, 324 (1994).

Davis next argues, perhaps in the alternative, that he was in custody because the detectives "confronted [him] with evidence, including video surveillance and witness statements connecting him to the alleged assault." Doc. 98 at 2. To the extent Davis argues that this evidence put him on notice that he was a suspect and therefore affected his perception that he was free to leave the interview, this argument cuts in favor of a custody finding. Indeed, "the fact that the individual has become the focus of the investigation is relevant 'to the extent that the suspect is aware of the evidence against him' and this awareness contributes to the suspect's sense of custody." *Griffin*, 922 F.2d at 1348 (quoting *United States v. Carter*, 884 F.2d 368, 370 (8th Cir. 1989)); *see also Stansbury*, 511 U.S. at 325. Even so, however, "the fact that the purpose of the questioning is to further focus the investigation on the defendant 'does not weigh heavily in [the] analysis.'" *Griffin*, 922 F.2d at 1348 (citation omitted). In other words, this factor is not dispositive. *See Stansbury*, 511 U.S. at 325.

Finally, Davis states that he was "compelled by implicit authority pressures unique to police-police interrogations, particularly when the subject is a subordinate officer being questioned about misconduct." Doc. 98 at 2. But the custody inquiry focuses on "the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury*, 511 U.S. at 323.

Based on the totality of the circumstances and the *Griffin* factors, the Court finds that Davis was not "in custody" for *Miranda* purposes. Accordingly, the Court overrules Davis's objection. Doc. 98 at 1–2.

## 2.    Voluntary statements

Davis also objects to Judge Dueker's conclusion that his statements to Detectives Percich and Adams were voluntary.  Doc. 98 at 2–3.  He argues that the record shows that (1) "multiple officers contacted [him] in the days leading up to the interview," thus pressuring him; (2) he was "a relatively inexperienced officer" and therefore "uniquely susceptible to command-pressure dynamics when questioned by senior investigators"; and (3) the interview "followed a phone call initiated by detectives, during which they set expectations for compliance."  *Id.* at 3.  He thus concludes that "[t]he cumulative pressure from the department, the setting, and the investigative posture renders the statements involuntary."  *Id.*

"A statement made outside of a custodial interrogation may be suppressed if it is not made voluntarily."  *United States v. Mattox*, 27 F.4th 668, 674 (8th Cir. 2022).  A statement is involuntary when it is "extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination."  *Id.*  To determine if officers have overborne a defendant's will, courts examine "the totality of the circumstances, including both the conduct of law enforcement in exerting pressure to confess on the defendant and the defendant's ability to resist that pressure."  *Id.* at 675 (citation omitted).  When a defendant seeks suppression of his statements, the United States bears the burden of persuasion and "must prove by a preponderance of the evidence that the challenged statements were voluntary."  *Id.* (citation omitted).

Factors that courts may consider in determining whether a defendant's statements were voluntary include "the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition."  *United States v. Magallon*, 984 F.3d 1263, 1284 (8th Cir. 2021) (citation omitted).

15

Here, the record shows that Davis voluntarily made his statements.  Detectives Percich and Adams did not engage in any coercive police behavior; they were not armed during the interview, doc. 90, Evid. Hr'g Tr. at 11:7–11:8, nor did they raise their voices at Davis at any point, *see generally* Ex. 2.  And Davis confirmed during the interview that the detectives did not threaten, compel, or promise him anything to make a statement.  Ex. 2 at 6:40–7:07.  Davis stated only that he had "lots of very oddly direct, but vague conversations over the phone with a few other officers," most of whom had been reaching out to make sure he was okay.  *Id.*  But he did not state that these other officers threatened him, intimidated him, or otherwise promised him anything in exchange for his making a statement.  At most, these phone calls from other officers perhaps could in certain circumstances be construed, viewed in a light most favorable to Davis, as external psychological pressure; but, Davis's statement about "oddly direct, but vague conversations" with other officers hardly supports a finding of involuntariness here.  *Id.*  And "[a]bsent improper threats, use of physical force, or intimidation tactics, psychological pressure almost never renders a confession involuntary."  *United States v. Roberts*, 975 F.3d 709, 718 (8th Cir. 2020).

Davis's personal characteristics also militate against a finding that his statement was involuntary.  At the time of the interview, Davis was twenty-six years old.  Ex. 2 at 4:56–5:10.  And he did not appear to be under the influence of drugs or alcohol.  *See generally id.*  Nor does Davis appear to be susceptible to undue influence:  he is an adult of normal intelligence and a police-academy graduate.  *Id.* at 6:10–6:30; *see also United States v. Simpson*, 44 F.4th 1093, 1098 (8th Cir. 2022) (finding that defendant's statement was voluntary in part because he was "an adult of average intelligence who has earned an associate's degree").  That Davis had been a police officer for approximately three years at the time of the interview, *see* Ex. 2 at 24:39–

16

24:48, also supports a finding that his statement was voluntary. *Cf. United States v. Syslo*, 303 F.3d 860, 866 (8th Cir. 2002) (finding that defendant's will was not overborne because he had worked as a security guard, made his statements with a confident attitude, showed familiarity with criminal procedure, and had experienced a prior interrogation by police); *United States v. Vinton*, 631 F.3d 476, 482 (8th Cir. 2011) ("A history of interaction with the criminal justice system supports an inference that an interviewee is familiar with his constitutional rights and that his statements to the police are voluntary.").

Finally, Davis argues that his interview "followed a phone call initiated by detectives, during which they set expectations for compliance." Doc. 98 at 3. The Court finds that the record does not support Davis's proposition that during the phone call Detective Percich "set expectations for compliance." *See generally* Ex. 1. But even accepting this argument as true, it fails. Davis does not argue that Detective Percich threatened, intimidated, or promised him anything during the phone call. So, even if Detective Percich's phone call created psychological pressure, this does not suffice to render Davis's statements involuntary. *See Roberts*, 975 F.3d at 718.

The totality of the circumstances shows that Davis's will was not overborne. His statements were therefore voluntary, so the Court overrules his objection. Doc. 98 at 2–3.

### B.    Motion to suppress evidence

Davis next objects to Judge Dueker's recommendation to deny his Motion to Suppress Evidence. Doc. 97 at 11–14. As noted above, Davis argues that the statements he made in his interview with the detectives were involuntary and made in violation of *Miranda*. *See* doc. 98 at 1–3. He therefore maintains that any evidence derived from these statements constitutes "fruit of the poisonous tree" and should be suppressed. *See id.* at 3. Thus, he asserts that Judge Dueker

erred in finding that the search-warrant affidavits contained no tainted evidence, because the affidavits "quote [his] interview in substantial detail" and rely on his admissions "to justify why digital records would contain evidence." *Id.* at 3–4. And without this tainted evidence, he argues, "the remaining affidavit does not establish a sufficient nexus between Davis's devices/accounts and evidence of the alleged assault." *Id.* at 4.

As explained above, the Court finds that Davis was not "in custody" for *Miranda* purposes and that he made his statements voluntarily. Any evidence which officers derived from his statements therefore does not constitute "fruit of the poisonous tree," so the Court declines to reevaluate the sufficiency of the search-warrant affidavits. The Court overrules Davis's objection. Doc. 98 at 3–4.

### C.     Motion to dismiss the indictment

Davis also objects to Judge Dueker's recommendation to deny his Motion to Dismiss the Indictment, or, in the Alternative, for a Bill of Particulars. Doc. 97 at 14–21. Specifically, Davis argues that Judge Dueker incorrectly found that all counts in the indictment satisfy Federal Rule of Criminal Procedure 7(c). Doc. 98 at 4.

Rule 7(c)(1) requires that an indictment "be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). An indictment satisfies Rule 7 if it (1) "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend," and (2) "enables [the defendant] to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974); *see also United States v. Leveke*, 38 F.4th 662, 669 (8th Cir. 2022). An indictment typically suffices "if its language tracks the statutory language." *United States v. Sewell*, 513 F.3d 820, 821 (8th Cir. 2008). So, "an indictment which

sets forth the words of the statute itself is sufficient, as long as those words fairly inform the defendant of the elements necessary to constitute the offense charged." *United States v. McKnight*, 799 F.2d 443, 445 (8th Cir. 1986). Thus, the Court will find an indictment insufficient "only if an essential element of substance is omitted." *United States v. White*, 241 F.3d 1015, 1021 (8th Cir. 2001) (citation modified); *see also United States v. Beasley*, 688 F.3d 523, 532 (8th Cir. 2012). Importantly, the test for sufficiency of an indictment "is not whether it could not have been made more definite and certain, but whether it contains the elements of the offense charged." *United States v. Tebeau*, 713 F.3d 955, 962 (8th Cir. 2013) (quoting *United States v. Debrow*, 346 U.S. 374, 376 (1953)).

Rule 12 permits a defendant to challenge an indictment for "failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(v). In reviewing such a challenge, the Court must "accept the [United States'] allegations as true, without reference to allegations outside the indicting document." *United States v. Welker*, 75 F.4th 820, 821 (8th Cir. 2023). This is because, "when courts go beyond the face of the indictment, they are testing the sufficiency of the evidence, not whether the indictment stated an offense." *United States v. Sholley-Gonzalez*, 996 F.3d 887, 893 (8th Cir. 2021). And "[f]ederal criminal procedure does not provide for a pre-trial determination of sufficiency of the evidence." *Id.* (citation modified). With all this in mind, the Court turns to Davis's objections.

### 1.    Counts 1 (conspiracy) & 2 (deprivation of rights)

Davis objects to Judge Dueker's finding that Counts 1 and 2 of the indictment satisfy Rule 7, alleging that Judge Dueker "improperly treats broad statutory recitations as factual allegations." Doc. 98 at 4. He argues that these counts are insufficient because they contain no "allegation[s] of a specific agreement forming the § 241 conspiracy," no "overt acts other than

conclusory statements ('acts included kidnapping')," and no "precise conduct constituting 'unreasonable force.'" *Id.* The Court agrees with Judge Dueker that Counts 1 and 2 satisfy Rule 7.

As to Count 1, the Court finds that the indictment tracks the language of the statute and contains the essential elements of the offense—namely, that Davis and Hill (1) acted under color of law, (2) knowingly and willfully conspired and agreed to injure, oppress, threaten, and intimidate C.G. in the free exercise and enjoyment of a constitutional right, and (3) performed a kidnapping. *Compare* doc. 1 at ¶ 8, *with* 18 U.S.C. § 241; *see Sewell*, 513 F.3d at 821. Count 1 also contains facts that "fairly inform[] [Davis] of the charge against which he must defend" and "enable[] [Davis] to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling*, 418 U.S. at 117. Indeed, the indictment (1) includes the date on which the charged conduct occurred, doc. 1 at ¶ 8; (2) includes the victim (C.G.), *id.*; (3) discusses the circumstances of how Davis came to interact with C.G. (i.e., while responding to a service call at the Walgreens in Northwoods), *id.* at ¶¶ 6–7; and (4) discusses the constitutional right that Davis allegedly infringed (i.e., C.G.'s right to be free from the use of unreasonable force), *id.* at ¶ 8. The indictment therefore puts Davis on notice of the particular conduct being charged.

As to Count 2, the Court again finds that the indictment tracks the statutory language and contains the essential elements of the offense—namely, that Davis and Hill (1) acted under color of law, (2) willfully deprived C.G. of his rights under the Constitution and federal law, (3) used a dangerous weapon, (4) caused bodily injury to C.G., and (5) performed a kidnapping. *Compare* doc. 1 at ¶ 10, *with* 18 U.S.C. § 242; *see Sewell*, 513 F.3d at 821; *see also United States v. Lanier*, 520 U.S. 259, 264 (1997) (listing elements of offense); 8th Cir. Model Jury Instr. (Crim.) § 6.18.242 (2021) (same). Count 2 also includes all of the facts alleged above for Count 1, *see*

20

doc. 1 at ¶¶ 6, 9–10, and it further alleges that Davis "drove C.G. to a field in Kinloch," where he "physically assaulted C.G. . . . by striking him with his police baton, while C.G. was handcuffed and did not pose a threat to anyone," *id.* at ¶ 10.  Thus, like Count 1, Count 2 "fairly informs [Davis] of the charge against which he must defend" and "enables [Davis] to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling*, 418 U.S. at 117.

Thus, accepting the allegations as true, *Welker*, 75 F.4th at 821, Counts 1 and 2 each state an offense.  The Court finds unavailing Davis's argument that the indictment does not include specific factual allegations regarding kidnapping, formation of the conspiracy, or unreasonable force.  Doc. 98 at 4.  "The test of the sufficiency of an indictment 'is not whether it could not have been made more definite and certain, but whether it contains the elements of the offense charged, and sufficiently apprises the defendant of what he must be prepared to meet . . . .'" *Tebeau*, 713 F.3d at 962.  The Court overrules Davis's objections to Counts 1 and 2.  Doc. 98 at 4.

### 2.      Count 3 (obstruction)

Davis also objects to Judge Dueker's finding that Count 3 of the indictment satisfies Rule 7, arguing that the indictment "does not allege that Davis knew the federal nature of the potential investigation or that he intended to obstruct communication with a federal officer."  Doc. 98 at 4 (citing *Fowler v. United States*, 563 U.S. 668 (2011)).  The Court agrees with Judge Dueker that Count 3 satisfies Rule 7.

As to Count 3, the Court finds that the indictment tracks the statutory language and contains the essential elements of the offense—namely, that Davis:  (1) knowingly engaged in misleading conduct toward another person; (2) with the intent to hinder, delay, and prevent the communication; (3) to a federal law enforcement officer and judge; (4) of information relating to

21

the commission or possible commission of a federal offense. *Compare* doc. 1 at ¶ 12, *with* 18 U.S.C. § 1512(b)(3); *see Sewell*, 513 F.3d at 821. As with Counts 1 and 2, Count 3 alleges facts regarding (1) the date of the alleged offense, doc. 1 at ¶ 12; (2) the victim (C.G.), *id.*; and (3) the circumstances of how Davis came to interact with C.G. (i.e., while responding to a service call at the Walgreens in Northwoods), *id.* Count 3 also alleges facts regarding Davis's "gone on arrival" report and why the United States believes the report was misleading. *Id.* Count 3 therefore "fairly informs [Davis] of the charge against which he must defend" and "enables [Davis] to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling*, 418 U.S. at 117. Accepting the allegations as true, *Welker*, 75 F.4th at 821, Count 3 states an offense.

The Court dispenses with Davis's argument that Count 3 is insufficient because it did not allege a "reasonable likelihood" that Davis knew the federal nature of the investigation or intended to obstruct communication with a federal officer. Doc. 98 at 4 (citing *Fowler*, 563 U.S. at 677). Davis erroneously conflates what the United States must include in the indictment with what the United States must ultimately prove at trial. *See Fowler*, 563 U.S. at 671–78. As discussed above, the United States included in Count 3 the essential elements of the offense and enough facts to put Davis on notice of the particular conduct charged. The United States is not required, at this stage, to prove Davis's knowledge or intent. *See Sholley-Gonzalez*, 996 F.3d at 893 (noting that federal criminal procedure "does not provide for a pre-trial determination of sufficiency of the evidence"). The Court overrules Davis's objection to Count 3. Doc. 98 at 4.

### 3.   Count 4 (falsifying records)

Davis lastly objects to Judge Dueker's finding that Count 4 of the indictment satisfies Rule 7. He argues that Judge Dueker "fails to address whether turning off a body-camera is a

'record' alteration at all under § 1519" and "fails to consider . . . whether Davis acted 'in contemplation' of a federal investigation." Doc. 98 at 5. He also argues that "the indictment's bare assertion that BWC deactivation constitutes falsification is conclusory and legally insufficient." *Id.* The Court agrees with Judge Dueker that Count 4 satisfies Rule 7.

As to Count 4, the Court finds that the indictment tracks the statutory language and contains the essential elements of the offense—namely, that Davis: (1) knowingly altered, concealed, covered up, and falsified a record and tangible object; (2) in relation to and in contemplation of a matter; (3) within the jurisdiction of a federal agency (here, the FBI); (4) with the intent to impede, obstruct, and influence the investigation and proper administration of that matter. *Compare* doc. 1 at ¶ 14, *with* 18 U.S.C. § 1519; *see Sewell*, 513 F.3d at 821. Count 4 also alleges facts regarding the date of the offense, the victim, and how Davis committed the offense (i.e., "by turning off his department-issued body worn camera before concluding his interaction with C.G."). Doc. 1 at ¶ 14. Count 4 therefore "fairly informs [Davis] of the charge against which he must defend" and "enables [Davis] to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling*, 418 U.S. at 117. Thus, accepting the allegations as true, *Welker*, 75 F.4th at 821, Count 4 states an offense.

Davis's remaining arguments—i.e., that Judge Dueker failed to address (1) whether turning off a body camera is a "record" alteration and (2) whether Davis acted "in contemplation" of a federal investigation, doc. 98 at 5—do not move the needle. As to his first point, Davis appears to argue that the charged crime does not encompass his conduct—that is, that body camera footage is not a "record" for purposes of section 1519. *See id.* In such situations, the Court "engages in statutory interpretation," the starting point of which is "the language of the statute itself." *United States v. Flute*, 929 F.3d 584, 587 (8th Cir. 2019) (quoting

23

*United States v. Jungers*, 702 F.3d 1066, 1069 (8th Cir. 2013)).  Section 1519, a statute enacted in 2002, does not define the term "record."  *See* 18 U.S.C. § 1519.  Nor does section 1515 (the definitions section of the chapter) provide such a definition.  *See* 18 U.S.C. § 1515.  Thus, the Court must give the term its "plain, ordinary, and commonly understood meaning," which the Court may do by "turning to a commonly used dictionary."  *Christopherson v. Cinema Ent. Corp.*, 161 F.4th 525, 529 (8th Cir. 2025) (citation modified).

The word "record" denotes, among other things, (1) a "documentary account of past events, usually designed to memorialize those events," *Record*, *Black's Law Dictionary* (7th ed. 1999); (2) "something that recalls or relates past events," *Merriam-Webster's Collegiate Dictionary* 974 (10th ed. 2000); and (3) "evidence, knowledge, or information remaining in permanent form," *Webster's Third New International Dictionary* 1898 (2002).  Considering these definitions, the Court finds that body camera footage—which serves to preserve information about a law enforcement officer's past interactions with civilians—plainly falls within the ordinary meaning of the word "record."  Thus, Davis's challenge to Count 4 of the indictment on this ground fails.

As to his second point, Davis again appears to conflate what the United States must allege in the indictment with what it must prove at trial.  For this reason, his argument fails.  *See Sholley-Gonzalez*, 996 F.3d at 893.  The Court overrules Davis's objection to Count 4.  Doc. 98 at 5.

In sum, the Court overrules Davis's objections to Judge Dueker's findings regarding the sufficiency of the indictment.  And because the Court agrees with Judge Dueker that "the indictment sufficiently explains the nature[] of all the charges so that Davis can properly prepare

for trial," doc. 97 at 21, the Court also denies Davis's request for a bill of particulars, doc. 98 at 6.

### D.    Motion to sever defendants

Finally, Davis objects to Judge Dueker's recommendation to deny his Motion to Sever the Defendants on the Indictment. Doc. 97 at 21–26. Federal Rule of Criminal Procedure 8(b) provides for joinder of multiple defendants in a single indictment "if they are alleged to have participated in the same act or transaction . . . constituting an offense." Even when Rule 8(b) permits joinder, however, a trial court may "sever certain defendants' cases from others'" under Rule 14 to "protect defendants' fair-trial rights." *United States v. Delpit*, 94 F.3d 1134, 1143 (8th Cir. 1996); *see also* Fed. R. Crim. P. 14(a). Nevertheless, courts read Rules 8 and 14 "in favor of joinder," *Delpit*, 94 F.3d at 1143, because "[t]here is a preference in the federal system for joint trials of defendants who are indicted together," *United States v. Benton*, 890 F.3d 697, 713 (8th Cir. 2018) (citation omitted). This is especially true "when the defendants are charged as coconspirators." *Id.* (citation modified). So, "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants[] or prevent a jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993).

A defendant seeking severance "carries a heavy burden" of showing "real prejudice" from joinder. *United States v. Sandstrom*, 594 F.3d 634, 644 (8th Cir. 2010) (citations omitted). That is, he must show "something more than the mere fact that he would have had a better chance for acquittal had he been tried separately." *United States v. Oakie*, 12 F.3d 1436, 1441 (8th Cir. 1993) (citation omitted). A defendant can demonstrate real prejudice to his fair-trial right by showing "(a) his defense is irreconcilable with that of his co-defendant or (b) the jury

25

will be unable to compartmentalize the evidence as it relates to the separate defendants." *United States v. Mickelson*, 378 F.3d 810, 818 (8th Cir. 2004) (citations omitted).

When a defendant seeks severance so that his codefendant may testify on his behalf, he may demonstrate prejudice by showing two things. First, he must show that "it is likely his co-defendant actually would have testified." *Id.*; *see also Delpit*, 94 F.3d at 1144. Absent a "firm representation" to this effect, a district court does not abuse its discretion by denying severance on this ground. *United States v. Ali*, 799 F.3d 1008, 1023 (8th Cir. 2015) (citation omitted). Second, the defendant must show that his co-defendant's testimony would be "substantially exculpatory"—i.e., that it "would do more than merely tend to contradict a few details of the government's case" against him. *Benton*, 890 F.3d at 714 (citation modified).

### 1.    Proper joinder under Rule 8(b).

Davis does not object to Judge Dueker's finding that he and Hill were properly joined in the indictment. *See generally* doc. 98. Accordingly, the Court adopts Judge Dueker's findings and conclusions of law regarding proper joinder under Rule 8(b). Doc. 97 at 24–25.

### 2.    Prejudice under Rule 14

Davis argues that Judge Dueker erred by finding that Davis "failed to demonstrate that Hill's testimony is likely." Doc. 98 at 5. Specifically, he states that (1) "[j]oint trial virtually guarantees Hill will assert the Fifth Amendment, depriving Davis of compulsory process," and (2) "the law [] requires only a showing of likelihood of testimony supported by the circumstances." *Id.*

The Court finds that Davis has not shown that Hill would likely testify. The only information the Court has regarding Hill's inclination to testify are statements from Davis's counsel. *See* doc. 90, Evid. Hr'g Tr. at 40:15–40:19; doc. 46 at 1; doc. 94 at 1–2; doc. 98 at 5.

But importantly, "[a] defendant's assertion that his co-defendant might testify at a separate trial must find some independent support in the record." *United States v. Easom*, 569 F.2d 457, 458 (8th Cir. 1978); *see also United States v. Caspers*, 736 F.2d 1246, 1248 (8th Cir. 1984). Davis does not submit any independent evidence, such as an affidavit from Hill stating that he would testify at a separate trial. *See Caspers*, 736 F.2d at 1248; *Easom*, 569 F.2d at 458. Because Davis fails to show that Hill would likely testify, the Court need not address Davis's arguments regarding the exculpatory nature of Hill's testimony. *See Delpit*, 94 F.3d at 1144 (noting that defendant must meet both prongs of exculpatory-testimony test to show prejudice).

The Court finds that Davis has not established prejudice sufficient to justify severance under Rule 14. The Court therefore overrules his objection. Doc. 98 at 5.

## V.    Conclusion

Accordingly, the Court (1) overrules Davis's [98] objections; (2) sustains, adopts, and incorporates Judge Dueker's [97] Report and Recommendation; (3) denies Davis's [44] Motion to Suppress Physical Evidence; (4) denies Davis's [44] Motion to Suppress Statements; (5) denies Davis's [45] Motion to Dismiss the Indictment, or, in the Alternative, for a Bill of Particulars; and (6) denies Davis's [46] Motion to Sever the Defendants on the Indictment.

So ordered this 21st day of January 2026.

_____
STEPHEN R. CLARK
CHIEF UNITED STATES DISTRICT JUDGE